[Civ. No. 3046. Second Appellate District, Division Two.—February 19, 1920.]

WILHELMINE E. VISSCHER et al., Appellants, v. E. M. DIXON et al., Respondents.

[1] APPEAL — PROVINCE OF APPELLATE COURT — CONCLUSIVENESS OF FINDINGS BASED UPON CONFLICTING EVIDENCE.—It is the province of an appellate court to decide questions of law, the findings of a trial court based on conflicting evidence being conclusive upon appeal.

[2] CONTRACTS—PURCHASE OF STOCK—ACTION TO RESCIND—FRAUDULENT REPRESENTATIONS—FINDINGS—EVIDENCE.—In this action to rescind a contract whereby the plaintiffs purchased certain corporate stock, there was ample evidence to support the findings of the trial court that the defendants did not make any representations, as charged in plaintiff's complaint, either as to the indebtedness of the corporation or as to its income or monthly net profit.

[3] ID.—FINDING AGAINST MAKING OF REPRESENTATIONS—INDEBTEDNESS OF COMPANY — NEWLY DISCOVERED EVIDENCE — DENIAL OF NEW TRIAL—ABSENCE OF REVERSIBLE ERROR.—In such action, the trial court, having found upon sufficient evidence that the defendants did not make the representations which the plaintiffs

claimed were the inducements to purchase the stock, did not commit reversible error in refusing to grant a new trial on the ground
of newly discovered evidence showing that certain items of indebtedness appearing on the books were lawful charges against
the company, notwithstanding the plaintiffs entered upon the trial
believing that the books were correct and the testimony of one of
the defendants that the items in question did not constitute lawful
charges against the company took them by surprise.

APPEAL from a judgment of the Superior Court of
Los Angeles County. John W. Shenk, Judge. Affirmed.

The facts are stated in the opinion of the court.

Frederick Gros and C. E. McDowell for Appellants.

Bicksler, Smith & Parke and Arthur G. Baker for Respondents.

FINLAYSON, P. J.—Plaintiffs sued to rescind a contract
whereby they had purchased 924 shares of the capital stock
of the Brinks Express Company, a corporation. The asserted
right to rescind is based upon alleged fraudulent representations. Judgment passed for defendants; plaintiffs moved for
a new trial, which was denied; thereafter plaintiffs appealed
from the judgment and likewise from the order denying their
motion for a new trial. Since the order denying a new trial
no longer is appealable, the appeal therefrom must be dismissed.

The Brinks Express Company owns a number of auto
vehicles which it uses in the freighting business. It likewise
hauls mail for the government, for which it is paid fifteen
thousand dollars per year. Plaintiffs, Wilhelmine E. Visscher, and Hugo K. Visscher, are, respectively, mother and
son. It was the mother's money that bought the stock. The
son represented her in all her dealings with defendants and
the corporation. The defendants Henry H. Dixon and E. M.
Dixon are husband and wife. About December 1, 1913,
Mrs. Dixon bought the 924 shares from former stockholders
for ten thousand dollars. At the time when plaintiffs bought
the stock, 921 shares stood in Mrs. Dixon's name, two shares
in her husband's name and one share in the name of defendant Whittier. About February 26, 1914, Mrs. Visscher put
five thousand dollars into the business of the company, by

loaning that sum to the corporation, and receiving from it its promissory note for that amount, due on or before February 26, 1915, indorsed by Whittier as an accommodation indorser, and further secured by a chattel mortgage. As additional consideration for this loan, Mrs. Visscher's son, Hugo, was elected a director and vice-president and employed as assistant manager in charge of the automobile drivers and the machine-shop, at a salary of one hundred dollars per month. He continued thus connected with the corporation until April 23, 1914, when, according to the minutes of that date, he was discharged for incompetency and inattention to business. During the time Hugo was in the company's employ, and thereafter until he and his mother purchased the stock on June 19, 1914, he often spoke to others of buying Mrs. Dixon's stock, in order that he and his mother might thereby acquire the control of the company, and upon several occasions evinced a lively inclination to succeed Mrs. Dixon in the management of the business and the ownership of her controlling interest. About June 12, 1914, Hugo went to the office of Mr. Amend, Mrs. Dixon's personal attorney, for the purpose of settling a claim against the company for wages claimed to be due him. The interview that took place on that occasion between Hugo Visscher and Mr. Amend led to the negotiations that eventuated in plaintiffs' purchase of the 924 shares on June 19, 1914, for five thousand dollars, payable as hereinafter stated, and the release of defendant Whittier from all liability as an indorser on the note that the company had given Mrs. Visscher on February 26th next preceding. Pursuant to this sale Mrs. Dixon transferred to plaintiffs the 921 shares that stood in her name, the two shares that stood in her husband's name, and the one share that stood in Whittier's name. In consideration thereof plaintiffs agreed to and they did pay Mrs. Dixon fifty dollars, by giving a check for that amount, and likewise executed to Mrs. Dixon two promissory notes, payable to her order, one for two hundred dollars and the other for $4,750. At the same time Mrs. Visscher released and discharged Whittier from all liability as an indorser on the note for five thousand dollars that the company had given her on February 26, 1914, as evidence of its indebtedness for the five thousand dollars that she had loaned the company on that date. The only persons who participated in any of

the conversations that preceded the consummation of plaintiff's purchase of the stock were Hugo Visscher, representing himself and mother, Mrs. Dixon, representing herself and codefendants, and Mrs. Dixon's attorney, Mr. Amend. Neither Mr. Dixon nor Whittier took any part in the negotiations.

The complaint alleges that, to induce plaintiffs to make the agreement of June 19, 1914, whereby they purchased the 924 shares for five thousand dollars and released Whittier as an indorser on the company's notes, the defendants, through defendant E. M. Dixon and her attorney, Amend, represented: (1) That, at the date of the purchase of the stock, the Brinks Express Company was not indebted in a sum to exceed $11,295; (2) that the gross income of the company for the month of April, 1914, was $3,749.37, and for the month of May, $3,846.37; and (3) that in each of the months of April and May the company had made a net profit of between six hundred and seven hundred dollars, and that the business for those two months represented about the average monthly business of the company. Other alleged misrepresentations are set forth in the complaint, but as they were not pressed at the trial we have not deemed it necessary specifically to refer to them. It is alleged that the particular representations above specified were false in that: (1) at the date of the sale of the 924 shares to plaintiffs, the company was indebted in a sum in excess of $18,473; (2) that the gross income for the months of April and May, 1914, did not exceed $2,642.77, and $2,739.67, respectively; and (3) that during the months of April and May the business of the company was prosecuted without any profit whatever. Hugo Visscher testified that immediately after he and his mother purchased the stock he caused an examination of the books of the corporation to be made, that the books showed the indebtedness of the company to be at least $18,473, and the income for the months of April and May to be $2,642.77 and $2,739.67, respectively, and that the corporation was not making any profits.

The court found that defendants did not make any of the alleged representations, and likewise found against the falsity of each and every representation. Indeed, the findings of the court were wholly against plaintiffs on all the controverted matters, and were equally comprehensive upon the question of defendants' good faith and fair dealing.

Appellants earnestly argue that the evidence does not support the court's findings. [1] It is the province of an appellate court to decide questions of law. Findings of the trial court upon conflicting evidence are conclusive here. Though appellants avow full acquiescence in the well-established rule that an appellate court has not the right to disturb a finding if there is any substantial evidence to support it, their argument, nevertheless, is but a thinly veiled effort to induce this court to substitute its inferences of fact for those drawn by the trial court. This we may not do. [2] That there was ample evidence to support the finding that defendants did not make any of the representations alleged in the complaint, is, we think, clearly shown by the record, as a few excerpts will suffice to establish.

Mrs. Dixon describes as follows her connection with the negotiations that preceded the consummation of the sale of the stock: "I made no arrangement about the purchase at all. I did not talk with Mr. Visscher from the time I told him to leave [referring to the date of his discharge on April 23, 1914] until he came to the office to look the books over. I did not make any statements to him as to the condition of the company with reference to his purchase prior to that time, except what was talked over when he was there working. I never instructed anybody to deliver to him any message. Mr. Amend was my personal attorney. . . . I did not instruct Mr. Amend to tell Mr. Visscher anything about the business. Mr. Visscher came down June 18, 1914, the day before he purchased. Mr. Amend and I were also there, all the time. There was no one else in the upstairs office. Mr. Amend and Mr. Visscher came into the office and spoke to me, 'Good morning,' Mr. Amend says; 'Mrs. Dixon, Mr. Visscher would like to look over the books and see what he wants to know.' I said, 'Very well, the books are here. What is it you wanted to know, Mr. Visscher?' And he said, 'Oh, I understand the business, you know, Mrs. Dixon, but I wanted to know what was the April charges and the May charges?' [Meaning, as we understand the witness, the amount charged to customers for hauling done for them during the months of April and May.] And I said, 'All right, I will get them for you.' I went into the bookkeepers' room and brought out the charges

and turned the book leaf—turned the last leaf over, and in the books the last leaf of the full month's charges were there, the total amount for the month, to post into the ledger. Those charges consisted of duplicates turned over to customers. I showed him the amount to copy it off on a bit of paper he had in his pocket. I let him copy it from the books himself. . . . He had a chair at my desk and was taking it off; I was standing up beside Mr. Amend, by his side. . . . He took that amount and he said, 'Now, I want to know the cash.' I opened the cash-book and pointed to the revenue column and said, 'There, you know, is the amount for the month.' . . . I says, 'Now, don't you want to know about the accounts?' And he said, 'No, I guess I know all about the accounts.' And that was all that was said. . . . When he came to the June charges, I had only written them up as far as about the 11th, because I was so swamped with work I hadn't gotten down to date with them, and he said, 'That is a small amount for June.' I said, 'Yes, it is, but remember, this is only for about eight or nine days, and you have still the government check to count on.' [Referring to the sum paid by the government at the end of each month for hauling mail.] There was no remark made about the government check for April or May, and he asked for no other information about the business or concerning the books that day, or at any other time before he purchased. I offered to show him the books or anything he wanted to know. He was not there more than ten to fifteen minutes. . . . I made no statement as to the value of the stock. . . . *Nothing was said at the time about the indebtedness of the company at all.*" The witness also testified that she did not represent that the gross income of the corporation for the month of April was $3,749; that she did not represent that the gross income for the month of May was $3,846.37; that she did not make any statement other than what she already had testified to; that she did not make any statement that the business for the months of April and May netted it a profit of between six hundred and seven hundred dollars, or that that was the average business of the company for each month.

Mr. Amend, in describing his connection with the transaction, testified as follows: "I told Mr. Visscher that Mrs.

Dixon was a business woman; but that I didn't think she was a good woman to run a business of that kind because she was too impulsive and she might offend a great many customers on that account. I told him at that time [referring to the conversation which took place between the witness and Hugo Visscher in the former's office on June 18, 1914] *if the company had proper management* I thought the business was able to pay five hundred to seven hundred dollars a month. I never told him the profit for April and May had been seven hundred dollars for each month, or any statement similar to that, except in the general conversation as I have just testified. I don't know whether the company was making money or not. . . . I made no statement to Mr. Visscher regarding the expense account or the income of the company or regarding the accounts due. He did not ask me what the monthly income was or anything about the income. At his last visit to my office regarding the purchase of the interest he obtained on the 19th of June, we went to the Brinks Express Company. Mr. Visscher and I came into the office and I told Mrs. Dixon Mr. Visscher came down to look over the books. Mr. Visscher said that he wanted to know what the accounts receivable or the income for May was, and Mrs. Dixon said, 'All right,' and she went over and got the book. She got the book and laid it on the table. Mr. Visscher copied them out of the book. We were only there from ten to twelve minutes. Mr. Visscher went over the items in the back of the book, and he asked Mrs. Dixon if the items for June had been entered up and she turned and showed him where the items for June were entered, and he remarked that the revenue for June had fallen off over May and April, and she said that the government account had not been entered on that item, and he said, 'Oh, well, that just brings it up to all the other months.' It was not discussed whether the government account had been added in the April and May figures. He got these figures from a book. I did not know what kind of a book it was. I think it came out, part of the conversation whether he wanted to look at all the books, and he said 'No,' he wanted to know what the revenue was for May and April. The books were in the safe and the safe-door was open. He did not ask for any other information

in my presence. I was in their presence all the time he was there.''

The testimony of Mrs. Dixon and Mr. Amend amounts, substantially, to this: No representations of any kind were made by either to Hugo Visscher; he wanted to see the books; his request was complied with; he was shown such books and documents as he asked for; he asked only for an inspection of the books and was given only that for which he asked—the books.

Plaintiffs make no claim that the books were false or that they did not correctly show all the debit and credit items. Indeed, plaintiffs say that it was from the books themselves, when examined by an expert bookkeeper, that they were able to, and, shortly after they took possession, did discover the true situation with respect to the company's financial condition. It was upon the books that plaintiffs relied to prove the falsity of the alleged representations.

We think that, from evidence adduced by defendants, the trial court was warranted in inferring that Hugo Visscher, a young man just out of college, densely ignorant of bookkeeping but possessed of abundant self-confidence, cherished the belief that, unaided and uninformed by others, he could form his own judgment of the actual or potential value of the business from an inspection of the books, coupled with such general knowledge of the business as he already possessed from his previous connection with the company, and that he rushed in with the impetuosity of youth only to discover later that his business acumen did not measure up to his own self-appraisement.

[3] Finally, it is contended that the court erred in not granting plaintiffs' motion for a new trial on the ground of newly discovered evidence. At the trial plaintiffs sought to prove the actual indebtedness of the corporation from the company's books. Plaintiffs entered upon the trial believing that the books contained full and correct entries of all debit and credit items. Mrs. Dixon testified that at the date of the sale of the stock to plaintiffs the company's indebtedness was not as great as the books showed—that certain items that appeared in the books as debts of the company were incorrect—that they were not lawful charges against the company. Appellants claim that this testimony took

them by surprise for the reason that defendants, in their answer, had admitted the books to be correct. On their motion for a new trial plaintiffs filed the affidavits of certain persons for the purpose of showing that the items of indebtedness in question were lawful charges against the company. Even so, we see no reversible error in the refusal to grant the new trial. The court had found that defendants did not make the representations which plaintiffs claim were the inducements to purchase the stock. This finding, as we have seen, is supported by evidence sufficient to preclude a reversal upon the ground of insufficiency of the evidence. If the alleged representations were not made, it matters not what the actual indebtedness of the company may have been.

The appeal from the order denying the motion for a new trial is dismissed; the judgment is affirmed.

Sloane, J., and Thomas, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on April 15, 1920.

All the Justices concurred.